THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA | HON. JEROME B. SIMANDLE |
| v. | Criminal No. 03-354 (JBS) |
| WILLIAM OSCAR HARRIS, a/k/a Oscaro El Hari Bey, | **OPINION** |
| Defendant. |  |

APPEARANCES:

Christopher J. Christie
UNITED STATES ATTORNEY
By:  Norman Joel Gross,
     Assistant United States Attorney
401 Market Street, 4th Floor
Camden, New Jersey  08101

Edward F. Borden, Jr., Esq.
EARP COHN, PC
20 Brace Road
4th Floor
Cherry Hill, NJ 08034
     Attorney for Defendant William Oscar Harris

**SIMANDLE**, District Judge:

   This matter is before the Court upon Mr. Harris' motion [Docket Item 511] requesting that the Court terminate its April 22, 2004 Order (the "April 2004 Order") holding him in civil contempt.  As the Court explains in greater detail below, the Court issued an order in August 2003 (the "August 2003 Order") enjoining Mr. Harris from sending documents purporting to create liens or other financial interests to this Court, its employees, employees of the United States Department of Justice ("DOJ"), and other persons associated with his criminal case.  After Mr.

Harris continued to send such financially threatening documents, the Court found him in civil contempt of its August 2003 Order and ordered that he be confined until he agreed to cease sending such documents.  Since the entry of the April 2004 Order (see [Docket Item 192]), Mr. Harris has persisted in violating the August 2003 Order, continuing to send prohibited documents to the undersigned, numerous judicial officers of this Court, employees of the DOJ, and others connected with this criminal case, contrary to the August 2003 Order.  Despite his continued noncompliance with the August 2003 Order, Mr. Harris now moves the Court to terminate its April 2004 contempt citation and his continuing confinement for civil contempt.  For the reasons explained below, the Court will deny Mr. Harris' motion.

## I.  BACKGROUND

On May 6, 2003, Mr. Harris and eight other individuals were indicted on charges of having produced and conspiring to produce fraudulent money orders purporting to be issued by the United States Department of Transportation and the United States Department of the Treasury [Docket Item 1].  As the Court explained in detail in its April 2004 Opinion [Docket Item 193], after the filing of the indictment, Mr. Harris and several of his co-defendants began sending fraudulent financial security arrangements, contracts, and other financially threatening documents to, <u>inter</u> <u>alia</u>, the undersigned, numerous judicial

officers and employees of this Court, and employees of the DOJ. To address Mr. Harris' and his co-defendants' harassing conduct, which was designed to disrupt this forum, the Court entered an Order on August 27, 2003 enjoining Mr. Harris and his co-defendants from

> sending any written communications to this Court, to any judicial officer or employee of this Court, to the United States Attorney, to any Assistant United States Attorney, to any employee or officer of the United States Department of Justice, or to any attorney appearing in this case, whether in an official or allegedly "private" capacity:
>
> (1) Which attempts to create a lien or financial interest; or
>
> (2) Which purports to state a contract with such recipient regarding any civil or commercial matter . . .

August 2003 Order [Docket Item 107]. The Order further enjoined Mr. Harris and his co-defendants from "creating affidavits of debt or UCC Financing Statements . . . based upon the abovedescribed security agreements or contracts or liens however entitled." Id.

After it was brought to the Court's attention that Mr. Harris continued to send the very sort of documents prohibited by the August 2003 Order, the Court convened a hearing in April 2004, at which the Government presented evidence establishing that, notwithstanding the August 2003 Order, Mr. Harris'

harassing conduct had continued.[1]  In its April 2004 Opinion and Order, the Court found that Government had proven by clear and convincing evidence that Mr. Harris was in contempt of the August 2003 Order.  The Court found that "a coercive remedy [was] needed to curtail the continuing effect of these documents, and to prevent future creation of such documents by or on behalf of these defendants in violation of the Court's Order," and ordered that Mr. Harris "stand committed to the custody of the United States Marshal until he purges the contempt by signing an affidavit that the documents . . . are null and void, and that he will not participate in the creation of similar documents in the future."  April 2004 Opinion [Docket Item 193].

On July 2, 2004, Mr. Harris was found guilty of producing and conspiring to produce fraudulent money orders, and was sentenced on October 22, 2004 to a term of imprisonment of 188 months, which was to run consecutively to his confinement under the Contempt Order [Docket Item 380].  Although several of Mr. Harris' co-defendants have since ceased their contumacious mailings, and thus their civil contempt orders have been lifted so that they have begun to serve their prison sentences, Mr. Harris has not, to date, purged his contempt.  Instead, he has persisted in sending to the same persons the same sorts of

---

[1] The April 2004 Order also adjudged several of Mr. Harris' co-defendants in contempt of the Court's prohibition on sending financially threatening documents.

financially threatening documents that the August 2003 Order proscribed, despite his continuing confinement.  In 2007, for example, Mr. Harris sent the undersigned no fewer than nine documents ranging from invoices, to notices of interest charges on previously billed sums, to a notice of perfection of a claim agreement.[2]  The purpose of such documents, which bear phony indicia of actual contracts or perfected liens against persons connected with this case, is to create an appearance of the personal indebtedness of the recipients to Mr. Harris, as if some competent tribunal has declared such debts due and owing to Mr. Harris.  Such documents have been used by Mr. Harris and his co-defendants in the past to create false UCC filings with county clerks or state officials against the recipients, or to serve as the basis for petitioning to place recipients into involuntary bankruptcy due to unpaid "debts" in the millions of dollars.  Indeed, within the past year, Congress has recognized the problem of creation of such false lien claims against judicial officers and other governmental employees and has criminalized such conduct in the Court Security Improvement Act of 2007, codified at 18 U.S.C. § 1521.

---

[2] Copies of these documents from 2006 through January 2008 were indexed at the hearing on February 6, 2008, and counsel and Mr. Harris inspected these documents.  There was no dispute that they violated the terms of the August 2003 Order.

Notwithstanding his persistent noncompliance with the terms of the August 2003 Order, Mr. Harris now moves the Court to terminate his contempt citation.  On December 18, 2007, Mr. Harris filed a petition, ostensibly pursuant to Federal Rule of Civil Procedure 60(b), to vacate his contempt citation [Docket Item 511].  On January 2, 2008, the Court re-appointed attorney Edward Borden, Jr. to represent Mr. Harris in this matter [Docket Item 515], and counsel for Mr. Harris and the Government have since filed submissions addressing the issues raised in Mr. Harris' petition.

On February 6, 2008, the Court convened a hearing at which it afforded Mr. Harris and the Government the opportunity to present evidence and arguments as to whether the contempt citation should be terminated.  At the hearing, counsel for Mr. Harris conceded that Mr. Harris has not yet brought himself into compliance with the August 2003 Order and did not dispute the Government's contention that Mr. Harris is capable of so complying.  Mr. Harris also spoke to challenge this Court's jurisdiction over him and over the federal crimes of which he has been convicted.[3]  Also at the hearing, the parties and the Court

---

[3] The matter of this Court's jurisdiction over persons such as Mr. Harris who are accused of committing federal crimes in this district was addressed on numerous occasions.  It remains a frivolous argument, since Congress has conferred upon this District Court and its Article III judges the power to adjudicate federal criminal offenses alleged by the United States, see 18 U.S.C. § 3231.

6

recognized that if Mr. Harris were simply to desist from his contumacious conduct – even if he did not file a certification or an affidavit attesting to his compliance – it would be possible to find that the Contempt Order would serve no further purpose and that it could be dissolved, but Mr. Harris has, as yet, given no indication that he intends to cease his mailings of false and threatening lien claims. The Court reserved decision as to Mr. Harris' motion.

**II. DISCUSSION**

As the Court recognized in its December 18, 2007 Order [Docket Item 512], it has jurisdiction to review its civil contempt order, notwithstanding the fact that Mr. Harris has appealed from his judgment of conviction and his appeal is pending before the Third Circuit (Appeal No. 04-4115). As the Court explained,

> [t]his Court's review while Harris's criminal appeal is pending may not extend to the criminal appeal itself, since the filing of the appeal from this Court's final judgment of conviction divested this Court of jurisdiction regarding the criminal conviction. The authority to re-examine the basis for ongoing civil contempt, on the other hand, is inherent in this Court and the Defendant-Contemnor has the continuing opportunity to purge his civil contempt or to seek dissolution of the civil contempt order, even if the contempt order is also under appeal.

December 2007 Order n.1. The Court has jurisdiction to review its own contempt citation under the All Writs Act, which provides in relevant part that "all courts established by Act of Congress

7

may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

Mr. Harris, citing Judge Sotomayor's concurring opinion in Armstrong v. Guccione, 470 F.3d 89, 113-15 (2d Cir. 2006), argues that when it becomes apparent that a coercive contempt order is no longer fulfilling its purpose, due process requires that a civil contempt citation be reviewed and terminated, even if the contemnor has not purged the contempt. Mr. Harris argues that the eighteen-month maximum confinement period specified by the Recalcitrant Witness Statute,[4] 28 U.S.C. § 1826(a), "while not strictly determinative in a case not strictly within its terms, represent[s] a 'presumptive benchmark' for the maximum length of

---

[4] Mr. Harris cites as an alternative approach to the question of when a coercive contempt sanction becomes punitive the statement by the Court of Appeals for the Fifth Circuit in Petroleos Mexicanos v. Crawford Enter., Inc. that "[i]f the civil contempt proceeding is coercive in nature, the general rule is that it is mooted when the proceeding out of which it arises is terminated." 826 F.2d 492, 400 (5th Cir. 1987). In the passage quoted by Mr. Harris, the court cites Shillitani v. United States, 384 U.S. 364, 371 (1966), as authority. Shillitani stands for a more limited proposition than the expansive language quoted by Mr. Harris suggests, in that the Supreme Court simply held that "[w]here the grand jury has been finally discharged, a contumacious witness can no longer be confined since he then has no further opportunity to purge himself of contempt." 384 U.S. at 371. The language quoted by Mr. Harris thus does not represent an alternative approach, but at most stands for the same proposition as the concurring opinion in Guccione – that the Court should analogize Mr. Harris' situation to that of a recalcitrant grand jury witness.

8

a civil contempt term." (Def.'s Br. 2-3) (citing Guccione, 470 F.3d at 113-14).

The Government argues that because Mr. Harris is able to comply with the terms of the August 2003 Order, but has simply elected not to do so, the Court should not dissolve its contempt citation. The Government refers the Court to the decision of the Court of Appeals for the Third Circuit in Chadwick v. Janecka, 312 F.3d 597, 608 (3d Cir. 2002), noting that the court there held that where the contemnor "has the present ability to comply with the . . . order," id. at 612, there "is no federal constitutional bar to [his] indefinite confinement for civil contempt so long as he retains the ability to comply with the order . . ." Id. at 608. As for Judge Sotomayor's concurring opinion in Guccione, the Government argues that the majority opinion in that case not only criticized Judge Sotomayor's analogy to the Recalcitrant Witness Statute to a case where the contemnor was not a witness, but also rejected the notion that "there is no practical difference between one who is incapable of complying and one who simply chooses not to do so." Guccione, 470 F.3d at 108, 111 n.9. Given that Mr. Harris is able to bring himself into compliance with the August 2003 Order by simply ceasing the contumacious conduct, but has declined to do so, the Government argues that Mr. Harris' motion to terminate the contempt citation should be denied.

The Court will deny Mr. Harris' motion to dissolve his contempt citation. As the Court of Appeals recognized in Chadwick, "[t]he Supreme Court has never endorsed the proposition that confinement for civil contempt must cease when there is no substantial likelihood of compliance."[5] 312 F.3d at 613 (internal quotations omitted). Rather, as the Chadwick court noted, in Int'l Union, United Mine Workers of America v. Bagwell 512 U.S. 821, 828 (1994), the Supreme Court recognized that indefinite detention until the contemnor complies with a court order is the "paradigmatic coercive, civil contempt sanction."

Chadwick and Guccione teach that in the civil contempt context, there is a critical distinction between, on the one hand, a noncompliant contemnor who is unable to comply with a court order, and, on the other, one who persists in defying a court order notwithstanding his capacity to comply. See Chadwick, 312 F.3d at 609; Guccione, 470 F.3d at 111 n.9 (noting that "the point of Maggio[ v. Zeitz, 333 U.S. 56 (1948)] and

---

[5] The Court recognizes that in Chadwick, the Court of Appeals' analysis centered around whether the "state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," under 28 U.S.C. § 2254(d). Chadwick, 312 F.3d at 606-07 (quoting 28 U.S.C. § 2254(d)). The jurisdictional posture in Chadwick necessarily confined the analysis to assessing "clearly established Federal law, as determined by the Supreme Court," id., to which the Court's analysis in this case is not limited. Nonetheless, the Court looks to Chadwick for guidance regarding Mr. Harris' motion to terminate his contempt sentence.

Chadwick is precisely that there is a crucial difference between one who is capable of complying and refuses to do so and one who is not capable of complying"). Like both Chadwick and Guccione, there is no reason in this case to doubt Mr. Harris' capacity to bring himself into compliance with the Court's Order – Mr. Harris' attorney conceded at the February 6, 2008 hearing that there was no basis to question Mr. Harris' understanding of the August 2003 Order or his ability to comply with its terms. Indeed, at the hearing, the Court suggested to Mr. Harris that he need not submit a formal affidavit withdrawing his previous mailings, but may instead bring himself into compliance simply by ceasing from affirmatively sending out new documents; this is a simple task, compliance with which is certainly not outside Mr. Harris' capacity. Mr. Harris has refused to acknowledge the command of the Court's Order or to even attempt to comply.

The Court does not find convincing Mr. Harris' effort to analogize the circumstances in this case to the eighteen-month maximum confinement period imposed by the Recalcitrant Witness Statute, 28 U.S.C. § 1826(a). First, section 1826(a) "was carefully drafted to apply to one particular category of contemnor: A witness who refuses without just cause shown to comply with an order of the court to testify or provide other information." Guccione, 470 F.3d at 112 (quoting 28 U.S.C. § 1826(a)) (internal quotations omitted). Additionally, the type

11

of contumacious conduct exhibited by a recalcitrant witness is different in kind from the conduct Mr. Harris persists in pursuing.  A recalcitrant witness' conduct, though contumacious, is passive – it consists of <u>inaction</u> in the face of a court order to testify.  Mr. Harris' conduct, by contrast, is affirmative – he has actively taken steps to mail threatening, fraudulent documents to persons involved in this case in repeated defiance of the Court's orders.  The Court is not persuaded that "the class of contemnors for which Congress established the eighteen-month ceiling," <u>id.</u>, was intended to include affirmatively defiant contemnors such as Mr. Harris.  Every day of his non-compliance and his escalating pattern of contumacious and financially threatening conduct is another opportunity to inflict personal financial harm upon governmental employees and others involved in this criminal case.  When such phony "indebtedness" has been memorialized in UCC filings with county or state authorities in the past in this case, it has been necessary to go to court to request that such UCC liens be set aside, involving considerable burden to the targets of this harassment.

The Court has considered whether the contempt order should be dissolved because it has not proved sufficient to deter Mr. Harris' disruptive conduct.  It can be argued that if a contempt order cannot serve its deterrent function, it should be dissolved

lest it become punitive.  Certainly the Court recognizes that Mr. Harris has made a tragic choice to go out of his way to prepare and sign and send a continuing and escalating stream of threats, all calculated to disrupt the forum and to cause financial harm to the recipients.  He has demonstrated that he has no intention of complying with this Court's lawful orders.  It would be a bizarre result, however, to dissolve a lawful order of this Court merely because the contemnor persists in violating it through his continuing affirmative acts.  Unlike the situation of a recalcitrant witness, whose passive silence continues over time, Mr. Harris is an active contemnor whose non-compliance consists of continuing affirmative acts of harm and attempted harm to others.  In this situation, the fact that almost four years have elapsed without Mr. Harris ceasing his gross misconduct is not evidence for lifting the order; it is instead a demonstration that the order remains necessary until Mr. Harris decides to stop his unlawful conduct.  The Court will terminate the contempt order just as soon as Mr. Harris affirmatively signals his compliance.

   Because Mr. Harris continues to defy the clear requirements of the August 2003 Order, and because the Court finds no basis to terminate the civil contempt sentence of a contemnor who is able, but simply unwilling, to comply with its order, Mr. Harris' motion will be denied.

## III. CONCLUSION

For the reasons discussed above, the Court will deny Mr. Harris' motion to terminate his civil contempt confinement. The accompanying Order will be entered.

**February 20, 2008**                     **s/ Jerome B. Simandle**
Date                                           JEROME B. SIMANDLE
                                                          United States District Judge